May it please the court. I'm Steve Mather. I'm appearing for the appellants who were the petitioners in the United States Tax Court proceedings below, Michael and Cheryl Williams, who are with me in the courtroom today. This is a consolidated appeal. There were two separate cases that were involved in the tax court proceedings. One we refer to as the collection due process case and another one, the penalty case. Now, unless there are any questions, I'm going to forego any argument on the collection due process case and skip right to the penalty case, which is where the real need is. In the penalty case, the question that's presented is how many things the Internal Revenue Service can screw up and still win the case based on the presumption of official regularity. The background of the case is that the taxpayers invested in cattle breeding partnerships, which had an established record and, in fact, the structure of the partnerships had been the subject of previous litigation in the tax court and the partnerships had prevailed. What the taxpayers didn't know, what the Williams' didn't know, is that they were being defrauded by the promoter of the partnerships, who was selling essentially more cows than he had. The result of this was extended proceedings in the tax court that were incurred at the partnership level. In August of 2007, the IRS purported to bill the Williams' a little over $300,000 in tax and almost $600,000 in interest as a result of their participation in these cattle partnerships. In addition to the bills, the IRS also proposed penalties of almost $200,000 against the Williams'. And at this point, so what we have is we have a situation where there is an original tax amount of $300,000 and now the Williams' are faced with a bill of approximately $1.5 million. The problem and the issue in the case is that the IRS only has a certain period of time in which they may bill the Williams' for the tax that resulted from the partnership case. What's the status of the larger assessment? The larger assessments are unpaid at this point. There were seven years that were involved in the situation. Are they an appeal to the tax court, an appeal here? Well, the way it works is the partnership cases were settled and then after those cases are resolved, then the partners individually get billed. I know all that and I know that there were eventually these larger assessments and I know they were eventually being challenged in the tax court and I want to know what's happened to them. Well, the they remain unpaid at this point and the question And are they final? Are there still dispute about them? Well, the dispute, which is the issue that's present in this case, is whether the IRS billed it on time. And if the court determines that the large assessments were billed on time, then the IRS will There's no settlement with respect to them in any way? No, no settlement with respect to that. It's purely a question of timing. The IRS had 15 months after the conclusion of the tax court case to bill and they say they waited until the very last day in that 15-month period. And the problem that we have in our case here is that the IRS can't prove that they billed it on that day. And if they didn't bill it on that day, there is no, the large assessments are not due and correspondingly the penalties, which are at issue in the penalty case, can't be imposed because there's no tax due. Can't have a penalty without a tax. So that's the issue. Do we have before us a challenge to the assessments as opposed to the penalties on the large, large amount? The Williams' conceded on the merits that the penalties were due, but challenged only the issue of whether there was a tax that was timely. Because on the theory that if there's not a timely tax, there can't be a penalty. So the only issue left in the case is the timeliness of the assessment. And that's the difference between August 14th and August 15th. Well, that's part of the difference, yes. The IRS claims originally the IRS said that they had until August 14th to bill the tax. Then they changed their mind. Well, that was based in part on the IRS's own internal paperwork, which said that August 14th was the last day for three out of these six years. But that's wrong. It was wrong. I mean, they deliberately put the wrong day on their own paperwork. So what's your problem? I mean, they're legally correct. They've corrected it in time. What's your problem on that point? Well, on that point, I would concede that they had until the 15th as a matter of law, apart from the fact that they, you know, alleged something else. The important thing, though, is that there is one document in here that is the critical document, that the IRS cannot bill a taxpayer until they prepare and sign what's referred to generally as an assessment register. It's referred to here as the RACS report and some other things. And so in the record in the case, which appears at, I'm missing the page right now, but page and the excerpts. 298 to 300. 298 to 300. Yes, thank you. This is a document that the IRS, it's the critical document, maybe the most important document that the IRS has. And there is no way to trace from that document anything related to our case. There is no identifying number. There's no amount. The first page doesn't reconcile to the second page, which doesn't reconcile to the third page. They offered the testimony of a witness in the trial that said, well, I don't really know anything about how this is prepared. And then she proceeded to offer opinions about the documents that are clearly false. So the question then becomes, all right, so we don't have real proof that this piece of paper that the IRS says is important is really important. There's nothing to connect it to our case. So the IRS then offered a number of other documents to prove that this act was taken on August 15. Well, it turned out all of those documents or the majority of those documents were dated in advance. That was the date that the IRS wanted to take a particular action. It was not any kind of a date that was entered on the documents when they did take the action. So none of those documents provided any kind of evidence. Well, what does it mean to take the action? I mean, it means to decide that these people owe X amount of money. Right. But the action is actually the signing of the register of assessment, which is statutorily required for a bill to be offered. The register of assessment didn't have a date on it? It had a date on it, but you can't tell if it's really ours. It doesn't have any connection with our case. There is this document and the excerpts at 298, but there's no connection. There's no way to connect it to our case. And there's no testimony or anything else that says so. Well, I thought they said they disaggregated it or something. They thought they did connect it up. I must say I can't recreate what they were doing, but they claim there is a way to figure out that it is their case. Well, that's what they claim. But even the third page, which is supposedly something that is related to our taxpayer, has five entries or five lines on the page, essentially. We have six assessments. So, you know, something somewhere is missing for us because it doesn't even. It's 298. Is that what you said? 298. 298. This is the so-called assessment register. Don't the numbers add up? What? Don't the numbers add up? No, the numbers on the first page don't correspond to the numbers on the second page. And they supposedly, they have, our case has something to do with the numbers on the third page. But as I said, there's five entries there and we had six assessments. So I don't, you know, and there's nothing else that connects it. There's no Social Security number. There's no amount. The numbers on the third page don't seem to have any amounts. Yeah, they don't have amounts. They just have a date and a number. And so it's our position that this doesn't really prove anything. The other documents weren't even dated at the same time. And what we do have is we have three documents that are contemporaneous at the time and are dated. First, we have the transcripts of account that our firm requested on August 20th. And they appear, let's see, for example, 1990 appears that the excerpt takes 301. And this indicates that it's generated on the. The piece of paper I have here doesn't have amounts and doesn't have the signature. Is that because it doesn't have it or is it because I just don't have, I don't have the whole document? This is what the IRS offered as the document that establishes that the assessment. And it doesn't have an amount? It doesn't have an amount. It doesn't have identification to our. Well, that's a different question. But the other ones do have amounts. And this one doesn't have an amount, does it? Yeah, the earlier two pages have amounts, but they don't reconcile to anything in our case. For example, on the first page they refer to 51 items of individual assessments totaling 735,000. We have six items that we're almost out of. So it doesn't even make sense. And so then what we do have on page 301, though, is we have the IRS transcript of accounts, the information the IRS almost always relies on exclusively. This is dated August 20th, five days after the IRS says they made the assessments, and there's no assessment. There's no balance to do. It's not until November 4th that we have a transcript like this that shows an assessment that was made on August 15th. Then later we have an official transcript that's done eight months later that shows that assessments were done on August 15th, but they're even out of sequence. They aren't even in date order, and there's no date for the entry for the certified transcripts. So basically, and then lastly, what we have is we have the envelopes for the bill. Now, by IRS practice, again, if you're talking about official regularity, the IRS practice is they mail the bill on the day that they make the assessment. Well, we know in our case that they mailed them on August 21st because we have the envelope that they came in. If August 21st is the date of the assessment, all of these assessments are too late. We're reviewing a tax court finding, is that right? That's correct. For a clear error? It's for the application of the presumption of official regularity under the facts of the case. I believe that that would be de novo in view, application of the determination of an evidentiary presumption on essentially undisputed facts. An undisputed record. All of the record in the case other than the testimony was stipulated. I believe my time is up. If there are any other questions. Thank you. May it please the Court. I'm Anthony Sheehan. I represent the Commissioner of Internal Revenue. I asked you my last question. Are we reviewing for clear error or what are we doing? Inasmuch as the council for the taxpayers has conceded the August 15th date, the review for the rest of it would be for clear error. Okay. Even the application of the presumption of official regularity? As to whether it can be applied here at all? That, I don't know, but in terms of the facts of this case, the underlying facts and the conclusions to be drawn from this I hope to explain. I believe it would be clear. I did not look up specifically the application of official regularity. I know the Court has asked several times for attorneys to try to explain things carefully, and I'm going to try to do that now with the summary record of assessment, which is on pages 298 to 300 of the record, and I think I can do so. This is the key document. Once this is signed, the assessments are made. And you can see from the document it is dated October or August, August 15, 07, both computer and handwritten dates. I don't think there should be any dispute that this document was signed on that date. Now, it's a summary record. Does it matter that there's no amount on here? As to these? Right. Maybe if you could just explain it. All right. Go ahead. Okay. On this document are aggregated the assessments of multiple taxpayers' multiple accounts. So if you look on page 298, the first number is 52 items, penalty of $220,000. So that is those 52 items add up to $220,000. The next line is one assessment of excise tax, which we don't care about. This is not an excise tax case. I'm sorry. Back up a minute. Yes. You're on page 298? Yes, 298. Okay. And where do you get the 52 items? Okay. If you look at class of tax. That's what I'm looking at. Then items. You trace down that column. It's individual, 52. Oh, I see. Okay. Thank you. And then trace across the penalty, 220,000. There was one excise tax assessment of $3,000. It wouldn't be us in this case. No. Fifty-one individual, going down to the next block, efficiency assessments. Fifty-one individual assessments for a total cumulative amount of $735,000. On and on. I could go through the rest of them. If you turn to the second. The cumulative is in the current assessments column? $735,000? Yes. Yes. Those 51, there are 51 individual assessments of various. That's 52. That's the 52 from the first part, and then minus one. No, no, no. There might be totally different people. There are 52 penalty assessments that add up to $220,000 of various taxpayers. Right. Okay. Fifty-one individual assessments in the 51 deficiency, under the category deficiency assessment, 51 individuals for a total of $735,000 in tax and $6,000 in penalty and $1,200,000 in interest. Okay. Next. Okay. On to the next page. This one summarizes things from the first page. So you'll find it in my brief, because I did add up the numbers on page 47 of the brief. There are a total of 103 individual assessments. That's the 52 current and 51 deficiency assessments from the first page. They total $2 million, which is the sum of the $220,000 and the numbers going across from the 51 on the first page. So those 52 plus the 51 is the 103, and if you add up all the tax amounts to the right of them, you'll get the $2 million. The excise assessment just carries over. It's one excise assessment of tax and interest totaling $4,000. Now, as I've said before, these documents aggregate assessments for many different taxpayers, and the question then becomes, how do we know that the Williams' assessments are on this document? And this is, of course, taking notes, so I'll pause for a moment. No, no. Okay. I understand. Okay. We go to the third page, and it lists the document locator numbers of all of the assessments. Now, what happens is that the assessment documents go to the assessment officer. They are entered into the RACS computer system and are assigned the document locator number. Every so often, the RACS computer spits out a summary record of assessment, and once it's signed, all of the assessments associated with the document locator numbers are thus assessed. Okay. So where's the document locator number? Okay. That's on page 300 of the excerpt of record. Yeah. And if you look at the first document locator number, I apologize for the quality of the copy. Mm-hmm. It's 295-122-7134. Mm-hmm. Well, on page 22 of my brief, I break that down. Twenty-nine is the code for the Ogden, Utah, campus where that was done. Two means income tax. The next two digits, 51, indicate this was a quick assessment, prompt manual quick assessment, because the statute was about to run out. 227 is the Julian date, which, again, is August 15th when this happened. And 134 is the block number. Now, after the block number, there would be normally a serial number from 0 to 99, and then the year number, which is 07. So every assessment, every serial assessment in the 134 block was assessed. Everything in that 134 block got assessed when this was signed. So when we can trace it through, for example, let me find a good page in the record here. If we look at, for example, the billing assemblies sent to the taxpayers, I just happened to open to a page. I picked it random, but it works for us. Page 333. And I might add that if you add up all the assessments against taxpayers, they easily fit within the aggregate numbers on the summary record. All right. But where can you see that number? I don't have 33. Okay. 329. How about that one? You've got a summary, Your Honor. Go ahead. If you look at any of the forms, 333 is in the record. I don't know if you have them available to you. Which are these account transcripts? That's what they are? Well, the form 5552 are billing records. Could you maybe come to a page? All right. Go ahead. Do it your way. Okay. I could do it both ways, actually. If you look at the forms, there's several forms, 53, 52. I've got ER 301, 314. Yeah, I have a 301. Okay. I'm going to get to those. I'll get to those in a moment, Your Honor. That's the next step to analyze. I mean, these all are in the excerpts, and I know the excerpts were voluminous. But if you look at the ER 204. 204. Okay, that's the certificate of assessments and payments. That's good. We can use that one. If you look at page 205, then, you'll see the first entry is quick assessment, and you'll see the exact same document locator number, but set out in its full form. It's the 292 for income tax, 51 for quick, 227 for Julian date of August 15, block 134, and then here we have the serial number 03, and dash 7 is for 07, which is the year. So this ties back. This is the IRS's entitlement under the Treasury regulations to link the summary record of assessment to the taxpayer through supporting records. Here is an example of a supporting record, and you can tie it back because a document locator number of the 134 block was on the summary record of assessment, and it's on the taxpayer's transcript. The forms 53, 52, likewise, in the upper right-hand corner, have the same document locator number generated off the summary record of assessment. And I know it's a lot to cover, Your Honor. It's all set forth in the brief. So what does this mean? What does it mean when you do a quick assessment? Somebody sits there and says, assessed, or what? Normally, the assessments are put into a computer. It takes a while for the computer to sync up. Meaning, but what I'm trying to say is it's a decision by a person that this is how much these people owe? No, I'm sorry, Your Honor. What is it exactly? Once the adjustments are made, if it's, if it needs to be done right now, it has to be done manually. The computer takes too long, and it's quick only in the sense that it's done manually rather than processed through the IRS computers, which are rather slow. It doesn't mean that somebody expedited it in terms of making a decision. It just means that somebody, you could call them manual assessments. But this is what I'm trying to understand. Okay. It's simpler than that. Something had to be done by August 15th. Right. What's the something? Somebody had to sign that summary record of assessment on page 298 through 300 of the excerpt. So it's just recording an already made decision or decision made by somebody else at some earlier time. Right. It has to be, the decision's already been made. It's just a matter of getting that bookkeeping entry done by that date. I see. Okay. Now. So the signature that's on 299. Yes. Is by, indecipherable, but assessment officer 815-07, that would be the. That did it. That's. Okay. Depends on the document and local numbers we link up. Two more points I'll make very quickly. There's been discussion of a transcript produced five days later. The computer system the assessment people use is different from the computer system out of which transcripts are generated. IRS witness Wendy Jones testified it can take six to eight weeks for these to sync up. This was done five days later. I know in the reply brief taxpayers are arguing that the IRS considers transcripts to be conclusive. We have never argued that. They are presumptive. The presumption is overcome. It was five days later. And the tax court found Ms. Jones' testimony to be credible, to be reasonable, and to be uncontradicted. In terms of the postmark date on the billing assembly, which was August 21st, normally we'd like to get those out the same day. There's Wendy Jones testified there's voluminous paperwork. Plus the Internal Revenue Code gives us, I think it's 6303 of the code, gives us 60 days to get those out. So effectively we got it out 54 days early. And there's no dispute. There's no legal dispute here that the clerical task of signing off on a previously made decision about how much tax they owe is the dispositive date. If I understand your question, yes, there's no dispute, legal dispute that the signing of that document makes the assessments. I thank the Court for its time and ask it to affirm. Thank you. Just a few quick points. The document that we were looking at on Excerpts 205, this is the document that is the official transcript. It was prepared eight months after the fact, and it has entries out of date sequence order. If you'll note on page 204, if you have that, the entry prior to this alleged assessments on August 15th is dated September 10th. So, you know, this is an after-the-fact rationalization, and the reference to the document. But what is your overall, your specific answer to the representation, now that we've had this document explained to us, that you can just go from that I was wrong about the number issue, because that was in the earlier pages, and that what this list on page 300 tells you is which determinations are covered by the earlier pages. And why doesn't that link up to you? Because there's nothing to show that we're in there. He says there is, because the numbers trace through to the numbers that were later used in the later documents that specifically relate to you. But they don't. There's nothing to trace. Well, it's a group. It's a group. It's a group there. Then you get to 204, 205, and they tie it back that way. Well, 204 and 205 are records of the account. It's the history of everything the IRS has done on the taxpayer's account or claims. Exactly. But it's demonstrating, or purports to be demonstrating, I just need a response from you, that you were part of this group, because the same number appears, that was on August 15th assessed. And what's wrong with that? Well, there's nothing that shows that we're in that group except subsequently developed records. So it's an evidentiary point you're making. Yes. I don't think there's evidence to establish we're in the group, essentially. Okay. Thank you. And that's a clear error to review. Yes. Thank you. And, again, we're basing it on the presumption, you know, of what? The backdated documents or the way the IRS does business. Okay. Thank you. Thank you. Okay. This matter is submitted.
judges: Pregerson, Fisher, Berzon